### Bowling v. Commonwealth.

April 28, 1942.

J. C. Bird for appellant.

Hubert Meredith, Attorney General, and W. ·Owen Keller, Assistant Attorney General, for appellee.

OPINION OF THE ·COURT BY STANLEY, COMMISSIONER— Reversing.

Ike Bowling appeals from a conviction of manslaughter and sentence of 15 years' imprisonment. He submits he was entitled to a directed verdict of acquittal and that the instructions are erroneous.

It is necessary to look to the evidence for the defense for a story of the tragedy. The· Commonwealth's evidence was only that Bowling had asked a neighbor to notify the officers that he had killed a man and wanted to surrender, and when the County Attorney and others arrived at his home they found Mart Harness on the floor mortally wounded by shot in the region of his left kidney, which the defendant stated he had fired under circumstances substantially as told at the trial.

Bowling lived in a box house with his wife, two daughters and a small son. A dozen witnesses testified he had a good reputation for general conduct and peace. Several testified the decedent had a bad reputation in those respects. Bòwling was 62 or 63 years old and his wife about 35. Harness, who was about her age, was a ne'er-do-well and bòotlegger, living here and there. He

came to the defendant's home to board in October, 1940, and soon began to get his wife drunk and became intimate with her. He attempted on one or more occasions to assault his thirteen-year-old daughter and sought to get her twelve-year-old sister to go away with him. Bowling ordered Harness away in January. Not long before he was killed he returned and began sleeping in defendant's barn, hanging around his family during the day in his absence. On one occasion Harness had tried to get the older girl to cook him something to eat, and when she refused he proceeded to do so himself on the defendant's grate. He had shown one of the girls a pistol and the other a knife, and told them he would kill their father if he bothered him. He told a neighbor something of his intimate relations with Bowling's wife and his purpose to run him away and take his place, and that if "the old man" interfered he would kill him. Bowling was told about this attitude and the threats.

On the night of March 11, 1941, as Bowling was partially undressed for bed, his wife called attention to a noise heard outside and through the window they saw somebody in their "potato hole." Bowling got his shotgun and went out, his wife and two daughters going with him. He testified he called upon the man to surrender, but "he refused to surrender any way until I called him the third time. He then raised up with his hands drawed to his pocket," and Bowling recognized him as Harness. Then, he testified, "there flashed through my mind about him being there with his pistol and showing it to her and saying that he would kill me and I was scared of my life." It was dark and he could only see the bulk of the man as he raised up and could not tell whether his face or back was to him; but he saw his hands go down as if to his pocket in a way demonstrated to the jury but not revealed in the record. The defendant was about 15 feet away when he fired. His daughter testified to substantially the same conditions and occurrences.

Bowling then went down to a neighboring store to have the merchant call the officers of the law. When he returned the wounded man asked that he take him in the house as he was cold. Bowling and his daughter helped him in and laid him on a pallet with covering before a fire. When the officers arrived they found Harness there and with Bowling's permission took a door off its hinges and carried him down the hillside on it to an ambulance.

Harness said to one of the men: "Ike thought I was in his 'tator hole' but I was only hiding behind it." It is not claimed the deceased had a weapon at the time. A club was found in the barn which he had said to one of the girls that he would use on her father if he should bother him. A sack with some potatoes in it was found at the "potato hole."

There are no contradictions in the testimony. The accused presented a consistent defense and his case is one that appeals strongly to the sympathies; certainly, the penalty is extreme. But we cannot say that the court should have directed a verdict of acquittal, for the man was shot in the back and the accused admitted shooting him. Hatfield v. Commonwealth, 264 Ky. 721, 95 S. W. (2d) 562.

The judgment must be reversed because of errors in the instructions. The accused stated that he fired upon the deceased in defense of his life. While he gives no indication that he shot the man because he had cuckoled him and despoiled his home (saying he didn't care for him taking his woman but didn't want him to take his life), the facts are sufficient to afford the inference that he shot because the man was on his premises stealing his potatoes. The first instruction covered murder and voluntary manslaughter. The second instruction stated:

"The taking and carrying away of personal property of the value of $20.00 or more against the will and without the consent of the owner with the intention to convert the same to the use and benefit of the taker and of depriving the owner of his property therein, is a felony."

The instruction then submitted the proposition that if the jury should believe from the evidence beyond a reasonable doubt that Bowling had shot and killed Harness, and—

"You further believe from the evidence that at the time he did so, the deceased, Harness, was engaged in the act of committing a felony by taking or stealing or carrying away property, and that the defendant, Bowling, without malice aforethought and not in sudden heat of passion or in sudden affray and not in self defense, as set out in instruction No. 1 and 2 shot and killed the deceased, Harness, solely to protect his property and to prevent the said Har-

ness from committing a felony as aforesaid, then you are authorized to find the defendant, Bowling, guilty of voluntary manslaughter.''

The self-defense instruction was Number 5.

First, it is to be observed that the instruction relating to the right of the accused to shoot in defense of his property did not condition the finding of guilt of voluntary manslaughter on the belief that he had not shot in self-defense as described in instruction No. 5, but as defined in instruction No. 1. As stated, that related to murder or the killing in sudden heat of passion or sudden affray, although it did contain the statement that the belief of the jury must have been that the killing was not in self-defense. We do not think that sufficient. The reference to instruction No. 2 in that same instruction, instead of No. 5, was doubtless inadvertent, but, nevertheless, it was misleading and erroneous.

Secondly. Instruction No. 2 was apparently patterned from that prepared by this court in Commonwealth v. Beverly, 237 Ky. 35, 34 S. W. (2d) 941. Both instructions are based upon the theory of killing to prevent grand larceny. But unlike the facts in the Beverly case there was no evidence here that the deceased was engaged in the commission of that crime. There is nothing to show that he was stealing or could have stolen $20 worth of potatoes. Instructions must be based upon evidence or upon hypothesis, supported by some evidence. It is as much error to give an instruction unsupported by evidence as it is to fail to give one on an issue supported by evidence. King v. Commonwealth, 187 Ky. 782, 220 S. W. 775; Davis v. Commonwealth, 193 Ky. 597, 237 S. W. 24, 23 A. L. R. 1551. The evidence in the case did authorize the giving of an instruction upon the theory that the accused shot to prevent the commission of a felony. But it was that of breaking into an outhouse belonging to or used with a dwelling house and taking away anything of value therefrom. Section 1162, Kentucky Statutes. An outhouse as used in such statutes has been variously defined. At common law any separate building belonging to a dwelling house, situated either within or without the curtilage, is deemed an outhouse. If a structure is so near to a dwelling as to be used with and as a part of it, then it comes within the protection of the statute. Hultin v. Klein, 301 Ill. 94, 133 N. E. 660, 20 A. L. R. 230, and Annotations; 30

Words and Phrases, Perm. Ed., Outhouse. We have held a chicken house to be of that character even though it adjoined a stable sixty yards from the dwelling and was separated from it by a fenced garden. Price v. Commonwealth, 25 S. W. 1062, 15 Ky. Law Rep. 837. It is stated in that opinion that a meat house or an ice house is to be so regarded. But in Dunn v. Commonwealth, 119 Ky. 457, 84 S. W. 321, the court declined to say that a smoke house is necessarily of that class, for its relation to the dwelling determines its character and the indictment under consideration in that case did not disclose its situation. See, also, Bean v. Commonwealth, 229 Ky. 400, 17 S. W. (2d) 262. In Willoughby v. Shipman, 28 Mo. 50, it is held that a spring house used in connection with a dwelling is embraced in the term "outhouse." A "potato hole" is a dugout, covered by a mound supported by boards or stones, in which potatoes are stored and protected from freezing. It is nothing more than a small outside cellar. The appellee's "potato hole" was only 25 or 30 feet from the door of his home. Therefore, it comes within the protection of Section 1162 of the Statutes; and if the deceased was breaking into it for the purpose of taking property of any value therefrom he was committing a felony. The instruction should have been based upon that theory.

The circumstances did not authorize an instruction, as contended by appellant, to the effect that if the deceased was trespassing upon the defendant's property with the felonious intention of killing or molesting him or his family, he could stand his ground and kill the trespasser if he had reasonable grounds to believe that it was necessary to protect himself or his family from great bodily harm or death, according to the ruling in Baker v. Commonwealth, 93 Ky. 302, 19 S. W. 975, and other cases. Upon another trial the evidence may develop conditions entitling the accused to an instruction on defense of his home (Roberson's Criminal Law, Sections 293, 294), but we do not regard that produced on the trial under review to have authorized it.

Judgment reversed.